19068

Anthony and Mary Lou MASTROPOLE, Respondents, v. TRANSIT HOMES, INC., and Leon Todd, of whom Transit Homes, Inc., is Appellant.

(175 S. E. (2d) 465)

*Messrs. Grimball & Cabaniss,* of Charleston, *for Appellant, Transit Homes, Inc.,*

*James H. Moss, Esq.,* of Beaufort, *for Respondents,* cites:

June 17, 1970.

BRAILSFORD, Justice.

This action arises out of the transportation by Transit Homes, Inc., a common carrier, of a mobile home, belonging to Marine Corporal and Mrs. Anthony Mastropole, from Stafford, Virginia, to Beaufort, South Carolina. The mobile home was damaged en route, and it arrived in Beaufort on July 29, 1968, some twenty-seven days later than expected. The carrier appeals from a verdict and judgment in favor of the Mastropoles for $5,103.00 actual damages and $45,-000.00 punitive damages.

The first and second exceptions challenge the sufficiency of the evidence to raise a jury issue as to actionable negligence and willfulness on the part of the carrier. We state the facts in the light of the settled rule that in passing upon these exceptions all conflicts in the evidence must be resolved in plaintiffs' favor, and they are entitled to the benefit of every favorable inference which may reasonably be drawn therefrom.

Upon receiving military orders transferring him to Parris Island, South Carolina, Corporal Mastropole called Transit

Homes, Inc. As a result, on June 27, 1968, E. Harvey Ring, Jr., representing the carrier, called upon the Mastropoles at Stafford, Virginia, where they were residing in their mobile home. He inspected the trailer for roadworthiness, advised the Mastropoles about the rates for the company's services, instructed them in detail as to how the trailer and its contents should be prepared and distributed for transportation, referred to in the record as "packing", told them that the driver would inspect to see that this had been properly done, issued a bill of lading for shipment of the trailer beginning on July 1, 1968, and received a deposit of $300.00 against total freight charge of $516.00. An additional charge would have been required if the carrier had undertaken to pack the trailer.

Ring spent about two hours with the Mastropoles. He had available an illustrated "Mobile Home Moving Manual," which had been printed by Transit for the information of shippers. However, Ring did not show this manual to the Mastropoles nor leave a copy with them. The instructions which he gave them were inconsistent with the manual in at least one significant particular.

The living room of the trailer was expandable by a roll-out section, referred to in the record as the "expando", which had to be retracted for highway transportation. When retracted, this section occupied about three-fourths the width of the trailer. Ring told the Mastropoles that the extra weight of this section should be balanced by placing certain heavy items, i. e., a sofa, chair and combination stereo-tv on the opposite side of the room. The manual stated that "under no circumstances should any items be packed inside" an expandable room. All of Transit's witnesses, including Ring who denied having given inconsistent advice, agreed with the manual and testified that the trouble which developed was caused by excessive weight in this area. These witnesses testified that the sidewalls of a trailer tie it together and support the frame in transit. Since the walls of the roll-out

section add weight but furnish no support, the frame is weakest here and will fail under additional weight. The best weight-carrying areas are near the front and over the axles.

Transit dispatched Leon D. Todd, an experienced driver, to haul the mobile home. He met Corporal Mastropole at the trailer park on the morning of July 1. The roll-out section of the living room had been retracted, the trailer had been unblocked, and it had been packed by the owners. Todd inspected the exterior and interior of the trailer and completed a "driver's inspection record" on a form furnished by the company, which was signed by him and by Corporal Mastropole. By his answers to numerous questions, Todd reported that heavy objects had been properly located in center and front of the house trailer, that the trailer did not appear to be overloaded, and, in effect, that it had been properly prepared for transportation. He also told the Mastropoles that "there shouldn't be no problem moving it." On this report as introduced in evidence the words "frame sags" were written under diagrams of the right and left side of the trailer, and the word "buckles" was written over the top on the left side. Corporal Mastropole denied that these conditions existed and denied that these words appeared on the report when he signed it.

After Todd connected the house trailer to his tractor, the Mastropoles left in their automobile for South Carolina. Todd told them that he would see them there the next morning, but this was not to be.

After Todd had driven about thirty-five miles, he noticed that the house trailer was tilting. He stopped to look for the cause and found that "the frame was giving under it." Todd called Transit's home office in Greenville, South Carolina, and was instructed by Ernest Yeager, the head of the company's claims department, to take the trailer to a repair facility in nearby Ashland, Virginia, for an appraisal of what repairs were needed and an estimate of the cost. Upon complying with these instructions, Todd left the house trailer there.

On the afternoon of July 2 Mastropole called Transit's home office to find out why the trailer had not arrived in Beaufort and was advised of the difficulty. He was also told that he would have to authorize the repairs, at a cost of $300.00, by wire before anything could be done. Mastropole, with apparent reluctance, sent such a telegram at 6:25 P. M. on July 3. This message was automatically transcribed by a Western Union machine in Transit's office. However, the office was closed and did not reopen until Monday, July 8. It was not until then that the Ashland facility was authorized to proceed with the repairs, which were finally completed on July 18.

On the next day, the same Mr. Ring who had first contacted the Mastropoles was dispatched to haul the trailer from Ashland to Beaufort. Ring checked the reenforcement of the right side of the frame, which was the extent of the repair undertaken, and went through the trailer to check the load and its distribution. Apparently satisfied then, although he later testified that the Mastropoles had completely disregarded his instructions in packing the trailer and had badly overloaded the "expando" area, he hitched the trailer onto his truck and started on his trip. Within a mile or two he noticed that the trailer was leaning to the right, and he pulled into a truck stop to investigate. When he ascertained by measurement that the trailer was tilting three inches to the right, he notified Mr. Yeager and was instructed to leave it at the truck stop. On the same day, according to Transit's witnesses, Mr. Yeager sent Del Roberts, who was chief of the company's field repairmen, to check the house trailer and determine what needed to be done.

Roberts testified that he arrived at Ashland on the evening of July 19 and that he spent all of the next day inspecting the trailer, taking pictures of it and its contents and studying the problem. At some time before 8:00 A. M. the following Monday, he concluded that the difficulty had been caused by excessive weight in the expanding living room. He also

concluded that because of the damage already done, the front of the trailer would not bear its normal share of the load, and that the weight would have to be concentrated over the axles. Soon after 8:00 o'clock, he called Mr. Yeager and told him what he proposed to do and expressed the opinion that the house trailer could be safely moved when this had been accomplished. Roberts testified that it took him until after business hours on Monday to complete his task. He called Mr. Yeager the next morning, July 23, and told him that the house trailer was fit for transportation.

A driver was dispatched to pick up the trailer on Thursday, July 25. After a stop en route over Saturday and Sunday, it arrived in Beaufort on July 29.

In the meantime, the Mastropoles had been beset by difficulties. Upon their arrival with their two small children, they obtained one small room, with furnishings inadequate for a family of four, at the Hostess House on Parris Island, where accommodations were available to service personnel for a limited number of days only. Most of the family's clothing had been left in the house trailer. The children were uncomfortable and could not sleep at night. As time passed, the Mastropoles became more and more upset and concerned about their mobile home and other belongings, and about the unexpected expenses being incurred. They had overstayed their time at the Hostess House and were being urged to leave. Corporal Mastropole made numerous unproductive calls to Transit's home office. According to his testimony, "they weren't very nice on the telephone." When he called after the second breakdown, he was referred to Mr. Yeager. We quote in part Mastropole's testimony concerning this conversation:

"He said, his exact words were it's one of those things. It's a bad trailer, it's a hoax and it's a jinx. He said forget the whole thing because we are not moving it down there.

"Q. And he refused to move the trailer?

"A. Yes, sir, he said they would not move it. I said well what am I supposed to do now. He said well just let the

finance company repossess it, forget the whole thing. I told him it was ridiculous and that's when I obtained counsel."

Shortly after this conversation, Mastropole consulted James H. Moss, Esquire, of the Beaufort Bar, and Mr. Moss made two telephone calls to Mr. Yeager. At the trial, Mr. Yeager flatly denied having told Mastropole or his lawyer that his company was not going to move the trailer to South Carolina. However, he did not state what he did say to them. Neither he nor any other witness for Transit testified that either Mastropole or Mr. Moss was advised that efforts to make the trailer roadworthy were being continued after the July 19 breakdown, or that Mr. Roberts had pronounced it ready for towing on the morning of July 23. By clear inference, no such advice was given prior to July 26, because, following these conversations with Yeager, the Mastropoles, who had been told that they had to leave the Hostess House, rented an unfurnished apartment for $140.00 per month and furnished it on credit. Then, on July 26, Corporal Mastropole drove to Ashland, Virginia, intending to retrieve the family belongings in a U-Haul trailer. Inferentially from the record, when Mastropole learned that the house trailer was en route to South Carolina, either he or his attorney notified Transit that it would not be accepted in its damaged condition, and that Mastropole could not pay the charges because of the expenses he had incurred by reason of the delay in delivery. By prearrangement, when Transit's driver arrived at Beaufort, he took the trailer to a storage facility. Mastropole testified that when the trailer arrived, it was "leaning way over to one side. It looked * * * like it had been wrecked." He was allowed to inspect the interior of the trailer and, inferentially, to remove the family belongings. He testified that these were in complete disarray, and that the load was distributed directly opposite from the instructions given him by Ring.

The trial judge submitted to the jury only three specifications of negligence and willfulness. The first of these was a

general charge of fault in the actual operation of the tractor while towing the house trailer. The second charged fault in the instructions given as to how the mobile home should be prepared for transportation by the owners. The third charged fault in failing to properly inspect and make sure that the trailer was safe for travel.

Transit urges that there was no evidence tending to support the charge of fault in the actual operation of the tractor while engaged in the towing operation. We agree. It further contends that it owed no duty to instruct plaintiffs as to how the trailer should be packed, and none to inspect it afterward. Hence, the case should have been withdrawn from the jury. We disagree.

When the Mastropoles were offered the choice of paying a fee to the carrier for packing the trailer or packing it themselves, the second alternative, which they chose, was not to pack on their own. The carrier offered to instruct and to inspect. When Transit's representative, an expert in the field, undertook to instruct them as to how the trailer should be packed, it was his duty to do so with reasonable care and diligence. There was substantial evidence that he violated this duty to plaintiffs' prejudice.

The Mastropoles were also entitled to the benefit of a reasonably diligent inspection by the initial driver. It was his duty to advise them of any obvious condition likely to result in damage or delay, and to give them an opportunity to correct any significant mistake made by them in packing the trailer. The record leaves no doubt but that he violated this duty, and the jury could with reason find that he did so willfully or recklessly. The driver testified that he knew from his inspection that the load was improperly distributed with excessive weight in the "expando" area. As an experienced mobile home mover, he knew the hazard involved, especially so if, as he testified, the frame was sagging. However, instead of pointing this out to the

owners and giving them the opportunity to correct their mistake, he told them that there should be no problem in transporting the trailer. Then, he added to the inspection report the comment, "Customer responsible for expando room and packing of trailer," and testified, in effect, that he did so in order to insulate himself and his employer from liability if the harm which he chanced should ensue.

The only authority relied upon by Transit in support of its claim that it owed no duty with respect to the packing of the trailer is *South Carolina Asparagus Growers' Ass'n. v. Southern Ry.*, 46 F. (2d) 452 (4th Cir. 1931). While the rationale of this decision does tend to support the carrier's claim, it is opposed by the weight of authority. Annot., 44 A. L. R. (2d) 993, 1000 (1955). We quote the majority rule as stated in American Jurisprudence:

"It is generally held that a carrier is not to be held responsible for the loss of goods during transit occasioned by imperfect loading on the part of the shipper where that defect was not apparent at the time it accepted the shipment. On the other hand, it is generally held, in the absence of statute and although there are some few cases to the contrary, that if the improper loading is apparent, that is, if it is a fact which addresses itself to the ordinary observation of the carrier, the carrier will be held liable notwithstanding the negligence of the shipper." 14 Am. Jur. (2d) Carriers, Sec. 531 (1964).

Furthermore, the same court which decided the *Asparagus Growers* case embraced the majority rule in *United States v. Savage Truck Line,* 209 F. (2d) 442 (4th Cir. 1953), 44 A. L. R. (2d) 984. We quote from the opinion:

"When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but, if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper. * * *" 209 F. (2d) at 445.

The exceptions which challenge the sufficiency of the evidence to sustain the verdict are without merit.

The third exception charges that the court erred in submitting the issue of punitive damages to the jury and in refusing to grant judgment *non obstante veredicto* as to punitive damages, the error being "that the Court failed to apply the applicable Federal Law relating to Interestate Commerce including the 'Carmack-Cummins Amendment', 49 U.S.C.A., Section 20(11) and the applicable Federal decisions relating to the right to recover punitive damages against a corporation."

This exception raises no issue for determination by us because no motion was made at the trial that the issue of punitive damages be withdrawn from the jury or that a verdict be directed for the defendant as to such damages. The *non obstante* rule may be invoked only when a timely motion has been made at the trial. *Norton v. Ewaskio*, 241 S. C. 557, 129 S. E. (2d) 517 (1963).

We quote the fourth exception:

"That the Court erred in failing to give full faith and credit to the United States Constitution and Statutes and decisions of the United States Courts in an action for damages to interstate shipment of property, when the Federal question was established by the pleadings and the evidence, and was clearly before the Court."

We are unable to ascertain from this exception what proposition of law or fact the appellant wishes us to review. Thus, the exception does not conform to the requirement of rule 4, section 6 of the rules of this court and raises no issue for determination by us. If, however, as suggested by the brief, the complaint is that the court failed to charge the Carmack-Cummins Amendment to the Interstate Commerce Act, 49 U. S. C. A., Sec. 20(11), the point is without merit. The statute, with certain exceptions, imposes absolute liability on an interstate carrier for loss, damage or injury to property caused by it. Defendant took the position at the trial that this statutory liability was

inapplicable because this action sounded in *tort* and was based upon specific allegations of negligence. Counsel for plaintiffs acquiesced in this view, and the trial judge instructed the jury that the burden was on plaintiffs to prove actionable negligence. To have instructed the jury on the carrier's statutory liability would have been inconsistent with the theory on which the case was tried.

Furthermore, counsel for defendant responded in the negative when asked at the conclusion of the charge whether there were "any objections to the instructions or requests for additional instructions," and no exceptions to the charge have been taken on this appeal. [1]

The two remaining exceptions, 5 and 6, charge that the court erred in failing to grant a new trial absolute because the verdict for punitive damages was so excessive as to show prejudice, etc., or in failing to grant a new trial *nisi* because of undue liberality on the part of the jury. These exceptions have been abandoned by the failure of counsel to argue them in the brief, and need not be considered.

The following additional points have been argued in the third subdivision of the brief as though raised by exceptions 5 and 6.

1—The motion for judgment *non obstante veredicto* as to punitive damages should have been granted because punitive damages are not recoverable from a carrier for loss or damage to property in interstate transportation.

2—If such damages are recoverable, their allowance is subject to the "Federal rule that punitive damages cannot be awarded against a corporation unless there was participation or ratification by an officer or supervisory official of the company."

3—Recovery against the carrier could not exceed the released value of the property being transported as stated in the bill of lading, *i. e.*, $7,500.00.

---

[1] Counsel for Transit on this appeal were retained after the trial.

These questions are not properly before us because they were not raised in the trial court and, except for point 1, have not been raised by any exception on this appeal. Point 1 is without merit for the reason stated in overruling exception 3.

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.